Valley Camp Coal Company v. Commissioner.
Valley Camp Coal Co. v. Commissioner
Docket No. 4129-64.
United States Tax Court
T.C. Memo 1967-225; 1967 Tax Ct. Memo LEXIS 34; 26 T.C.M. (CCH) 1147; T.C.M. (RIA) 67225; 27 Oil & Gas Rep. 565; November 9, 1967
*34 Valley Camp's business includes mining coal. It is a parent corporation having several subsidiaries, including Bethany, which is a holding company to which titles to inactive, reserve coal lands are transferred. Bethany has never had any operating capital. Valley Camp owns some coal lands and mines coal from some of them. In 1948, Wheeling, an unrelated corporation, leased the coal mining rights in the Alexander mine to a subsidiary of Valley Camp from which Valley Camp acquired the lease in 1948. Valley Camp exercised in 1959 an option to extend the end of the term of the lease from December 31, 1962, to December 31, 1967. The royalties under the lease were 7 cents per ton of coal mined, plus a small additional amount. Valley Camp took out over 600,000 tons of coal a year. At the end of 1959, 10,623,933 tons of coal remained in place. At 7 cents per ton, the coal in place would yield total royalty payments of $743,685, plus a small additional amount at one cent per ton, about $14,000. In 1959, Valley Camp completed negotiations with Wheeling to purchase the fee interest in the Alexander mine property. It was arranged that title would be transferred to Bethany. Bethany did not *35 have any capital to use in making such purchase. Wheeling agreed to sell the property for $740,639.65. Valley Camp transferred this amount to Bethany, and Bethany took title to the property. The lease was outstanding and in 1960, Valley Camp paid the lease royalties to Bethany, $48,759.25, on 667,989 tons of coal mined, and deducted that amount from its income. Held: Upon the facts, that Valley Camp was the purchaser of the Alexander property, in substance, as of January 1, 1960; that Bethany was merely a conduit through which Valley Camp paid Wheeling the purchase price; that Bethany was only the nominal holder of the bare legal title; and that Valley Camp was not entitled to a deduction for alleged coal royalty payments to Bethany in 1960, but was entitled to an increase in its depletion deduction, as determined by respondent. Frank E. Bubna, 110 Nat'l City Bank Bldg., Cleveland, Ohio, for the petitioner. Gordon B. Cutler, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined income tax deficiencies of $60,003.74 for 1959, and $62,207.60 for 1960. By stipulations, the parties have disposed of the issues relating to 1959, to which effect will be given under Rule 50. The general issue relating to 1960 is whether in substance petitioner, *37 rather than its subsidiary Bethany, purchased certain coal lands in 1960, so as not to be entitled to a claimed deduction for payments to Bethany which were purportedly coal royalties. Findings of Fact The stipulations of the parties relating to 1959 and 1960 are so found and are incorporated herein by reference. Petitioner, hereinafter called Valley Camp, filed its returns with the district director of Internal Revenue at Cleveland, Ohio, where its principal office is located. Valley Camp Coal Company: Valley Camp was incorporated in 1907. Its business at all times has been the mining and sale of coal. James A. Paisley, a specialist in the acquisition of coal lands, and an organizer of petitioner, was the trustee of a trust created by an agreement dated July 20, 1920, amended in 1922, referred to later, which held coal deposit lands. As of March 10, 1959, the officers of Valley Camp were: Harry Ewig, president; Herbert Richey, T. N. Bradford, and O. B. Pryor, vice-presidents; C. W. Steiss and R. W. Homan, treasurer and assistant treasurer; and Henry McGinness, secretary, as well as counsel. E. R. Sepsi was the auditor. In 1959 and 1960, according to its tax returns, Valley *38 Camp owned the controlling shares of stock in the following corporations in the United States: Percent
of
Year
Stock
Stock Ac-
Corporation
Owned
quired
1. Pittsburg Seam Coal Co.
99
[?]
2. Great Lakes Coal & Dock Co.
100
1921
3. Valley Camp Stores Co.
100
1927
4. Penn. & W. Va. Supply Co.
100
1929
5. Bethany Coal Co.
100
1931
6. Kelley's Creek Barge Line Co.
100
1931
7. Valley Grove Coal Co.
100
1942
8. Kelley's Creek & N.W. Ry.
Co.
100
1950
9. Kanawha & Hocking Coal Co.
99
1951 In 1960, Valley Camp acquired 100 percent of the stock of 2 additional corporations, Maiden Mining Co. and Robbin Coal Co. In addition, Valley Camp owned 100 percent of the stock of both Valley Camp Coal Company of Canada, Ltd., and Fort William Coal Dock Company, Ltd., both in Ontario. In 1948 and before, Glendale Gas Coal Company, a West Virginia corporation, was a wholly owned subsidiary of Valley Camp. Its principal place of business was in Wheeling, West Virginia. Under circumstances stated later, Glendale was liquidated on December 31, 1948. As of December 29, 1931, Elm Grove Mining Company was a wholly owned subsidiary of Valley Camp. *39 Elm Grove was merged into petitioner as of December 31, 1935. In its income tax return for 1959, Valley Camp reported income as follows (prior to any adjustments by respondent): 1959
Gross Receipts
$33,272,979.13
Less: Cost, goods sold
29,545,037.28
Gross Profit
$ 3,727,941.85
Other income
767,909.76
Total income
$ 4,495,851.61
Total deductions
3,573,446.60
Net income
$ 922,405.01
Less special deductions
37,931.25
Net income
$ 884,473.76
In its tax return for 1960, petitioner reported income as follows (before respondent's adjustments): 1960
Gross Receipts
$25,995,374.72
Less: Cost, goods sold
21,928,179.40
Gross Profit
$ 4,067,195.32
Other income
886,579.02
Total income
$ 4,953,774.34
Total deductions
3,654,548.69
Net income
$ 1,299,225.65
Special deduction
37,931.25
Net income
$ 1,261,294.40
Valley Camp owned the fee interest in some of the coal lands from which it mined coal, namely, Valley Camp mines numbers 3 and 5, Maiden Mine No. 2, and Kelley's Creek Mine. Some of those coal lands are located in the northern panhandle district of West Virginia (Elm Grove) contiguous to coal lands owned by Bethany *40 (or in the name of Bethany). Valley Camp also mined coal on leased lands, including the Alexander property referred to later. Wheeling Steel Corporation is not related to Valley Camp or any of its subsidiaries. Prior to February 29, 1960, Wheeling owned the Alexander Mine in Marshall County, West Virginia, comprising about 4,000 acres. On February 29, 1960, Wheeling conveyed to Bethany Coal Company, by a deed dated January 1, 1960, all of the fee mining interest and mining rights in the Alexander Mine; all of Wheeling's interest in the outstanding lease of the mine, dated January 1, 1948; and all of Wheeling's other interests in improvements and fixtures on the property. Wheeling received $740,639.65 in 1960 for all of the Alexander property and interests therein, as is set forth later. The lease of the Alexander coal mine, surface rights, improvements, and equipment on the property, dated January 1, 1948, was from Wheeling to Glendale Gas Coal Company, and was for a term of 15 years ending on December 31, 1962, with the right to renew the lease for 5 years ending December 31, 1967. Glendale operated the Alexander mine during 1948, but it was liquidated as of December 31, 1948, when *41 Valley Camp acquired its assets, and then the lease was assigned to Valley Camp. Beginning in 1949, Valley Camp operated and mined the Alexander coal mine, and it has continued to do so ever since. Valley Camp, as the lessee, exercised the option, on January 7, 1959, to extend the term of the lease for 5 years to December 31, 1967. After the conveyance to Bethany by Wheeling, as of January 1, 1960, of all of Wheeling's interests in the Alexander property and coal mining lease, Valley Camp, then, was Bethany's lessee of the Alexander property, according to all of the formal steps taken. During the years 1948 through 1960, the tons of coal removed in each year from the Alexander mine were as follows: Year
Tons
1948
516,348
1949
338,143
1950
387,560
1951
406,059
1952
335,866
1953
305,662
1954
304,063
1955
465,757
1956
507,276
1957
623,765
1958
645,560
1959
632,822
1960
667,989
Total
6,136,870 The remaining recoverable coal in the Alexander mine is estimated to have been, on January 1, 1960, 10,623,933 tons. The royalties to be paid by the lessee, under the lease, for coal mined in each calendar year were and are as follows: For the first *42 200,000 tons, whether or not removed, in a year, 8 cents per ton; and for the balance of the coal mined in the year, 7 cents per ton. During 1960, Valley Camp paid royalties to Bethany in the total sum of $48,759.25; and Bethany reported the royalties in its 1960 tax return. In its 1960 return, Valley Camp treated all of the royalties it paid, including those paid to Bethany, as part of "Other costs" of goods sold in Schedule A. The total amount of royalties paid in 1960 was reported as $314,789.32. In its return for 1960, Valley Camp also took a deduction for depletion as a lessee of the Alexander coal mine in the amount of $70,349.61, which was included in its total deductions for depletion, $951,200.47. Upon his audit of Valley Camp's return for 1960, and in the deficiency notice, respondent determined, inter alia, that under sections 61 and 162, 1954 Code, Valley Camp in substance was the owner of the Alexander property and, therefore, was not entitled to a deduction of $48,759.25 for payments to Bethany of alleged coal royalties. Respondent also increased the deduction for depletion of the Alexander property from $70,349.61 to $95,521.26, an increase of $25,171.65. [1] *43 In the deficiency notice, respondent stated that he had made the determinations also under section 482. Bethany Coal Company: Bethany Coal Company, called Bethany hereinafter, was organized on December 26, 1931, under the laws of West Virginia. It was formed by the beneficiaries of the so-called James A. Paisley trust (created in July, 1920, referred to above) for the purpose of acquiring the assets held by that trust. Under a written agreement dated December 29, 1931, the beneficiaries of the trust agreed to transfer the trust assets, consisting of title to certain coal and related surface lands and certain stock of the Pittsburg Seam Coal Company, to Bethany in exchange for 32 shares of its common stock; the agreement was carried out; and Bethany's stock was issued to those listed below, who became the original shareholders of Bethany: Shares of
Bethany Com-
mon Stock
Elm Grove Mining Co.
16
J. A. Paisley Steamship Co.
4
Schneider Steamship Co.
4
Great Lakes Transit Corp.
4
Estate of H. W. Richardson
4
32
*44 On December 29, 1931, Elm Grove Mining Company was a wholly owned subsidiary of Valley Camp. The so-called James A. Paisley trust was also known as the "J. A. Paisley Trustee Account" which was a joint business venture that was carried on for over 10 years under a written agreement dated July 20, 1920. The parties to that agreement and the owners of the joint venture in 1920 were as follows: James A. Paisley, party of the first part; Valley Camp Coal Company, Paisley Steamship Company, and Great Lakes Transportation Company, Ltd., and Estate of Henry W. Richardson, the parties of the second part; Elm Grove Mining Company, party of the third part; and Mary A. Paisley, party of the fourth part. As of December 29, 1931, the interests in the Paisley Trustee Account (or trust) were owned by the following entities: Elm Grove Mining Company, 50 percent; Paisley Steamship Co., 12.5 percent (one-eighth); Schneider Steamship Co., 12.5 percent; Great Lakes Transit Corp., 12.5 percent; and Estate of H. W. Richardson, 12.5 percent. When the assets of the Paisley Trustee Account were transferred to Bethany in exchange for its 32 shares of stock, the shares of stock of Bethany were issued in the *45 same proportion to the then 5 owners of the Paisley Trustee Account; i.e., 50 percent, or 16 shares were issued to Elm Grove; and 50 percent, 16 shares, were issued, 4 shares to each of the other parties. In the Paisley agreement of July 20, 1920, amended by a supplemental agreement of March 1, 1922, James A. Paisley agreed that he held certain coal lands and other property as trustee for the named parties, including Valley Camp. The corpus of the Paisley trust consisted of several thousand acres of "reserve" (inactive) coal lands in West Virginia, in Brooke County and Ohio County, and 29-11/80ths shares (out of 42 shares) of stock of Pittsburg Seam Coal Company (Pittsburg), and certain notes of (owing by) Pittsburg. It was provided in the agreement of July 20, 1920, that a West Virginia corporation eventually would be organized to take over the assets of the Paisley trust. Bethany is the corporation which was organized to accomplish that purpose. On or about May 24, 1935, Elm Grove Mining Company sold to Bethany an additional 11-11/20ths shares of stock of Pittsburg at a price equal to Elm Grove's cost and expense of acquiring the shares. Bethany received from its shareholders *46 the funds required for the purchase. Bethany then owned 40-11/16ths shares out of the 42 shares of the issued stock of Pittsburg. [2]
Bethany never has engaged in the mining of coal. The coal lands held in the name of Bethany were nonoperating, reserve coal lands, at all times prior to 1960, and prior to the acquisition in 1960 of the Alexander Mine property, which was acquired in the name of Bethany. Since Bethany did not have any capital in cash, did not have any liquid assets, and ordinarily did not have any income, or had very small amounts of income at times, Bethany's sole stockholder, *47 Valley Camp, provided it with funds for the payment of the taxes on the property held in Bethany's name, and of Bethany's small expenses. When coal lands were acquired in Bethany's name, Valley Camp supplied the purchase price. (Before Valley Camp became the sole shareholder of Bethany, funds and capital were contributed to Bethany by its then shareholders.) Under the laws of West Virginia, the shares of stock of Bethany were non-assessable, so that any purported "assessment" of its stockholders, or stockholder, for funds by Bethany constituted a call for a capital contribution. From its organization in 1931 to some time in the 1950's, William H. Orkin, an employee in the real estate department of Valley Camp, was the treasurer of Bethany and was paid a salary for keeping its books, paying its taxes, and related services. (He was also the treasurer of Pittsburg.) Orkin ceased to perform services for Bethany at some time in the 1950's. Such services thereafter were performed by the accounting department of Valley Camp. Beginning January 1, 1960, Valley Camp charged Bethany $100 per month, or $1,200 per year, for such services. Since its incorporation, Bethany has maintained a separate *48 set of books and records; and it has filed its own federal income tax returns, and its West Virginia corporate returns. The board of directors of Bethany adopted a resolution on December 13, 1951, to accept the offers of the owners of 16 shares of its stock (other than Valley Camp) to sell their shares to Bethany for $59,111.85. The transaction was executed. Thereafter, Valley Camp was the sole shareholder of Bethany. Bethany did not have the funds to purchase the 16 shares, but obtained the funds from Pittsburg Seam Coal Company which, in turn, may have received the funds from Valley Camp. At December 31, 1951, the assets of Bethany as shown on its books were: Cash
$ 3,037.56
Notes receivable with face
value of $57,586.20 but re-
corded on the books at
27,061.26
2491.702 acres of coal lands
282,175.13
Investment in 40-11/16th
shares of stock in Pittsburg
266,297.01
Total assets
$578,570.96 At the same time, it owed $4.50 to the Internal Revenue, and $346.42 to the Sheriff of Ohio County, West Virginia. At December 31, 1951, Pittsburg had the following assets: Cash
$ 1,102.04
Coal lands
708,602.42
Total assets
$709,704.46 and on *49 said date it had the following liabilities: Internal Revenue
$ 4.50
Sheriff of Ohio County, West
Virginia
749.34
Notes payable
120,586.26
Total liabilities
$121,340.10
When Bethany purchased 16 shares of its stock from stockholders (Paisley Steamship Co., Schneider Steamship, Great Lakes Transit, and the Richardson Estate), those shares were then held as treasury stock, and there remained only 16 shares outstanding, which were owned by Valley Camp. Bethany did not receive from its stockholders, at the time of incorporation or early in its corporate life, any large amount of working capital. Instead, from time to time when the occasion arose, Valley Camp (its sole stockholder) made a contribution of capital to Bethany (without receiving additional shares of stock), and such capital was used by Bethany in acquiring a property, and, also, in paying its obligations. This procedure was customary. Among Bethany's expenses were taxes on properties it held, and an annual salary of $600 paid to William H. Orkin, Bethany's treasurer. Bethany has never had any income from which to pay dividends and never has paid any dividends. In 1957 Valley Camp made a contribution *50 to the capital of Bethany, $750,000, to enable Bethany to purchase inactive (not mined) coal lands in Tuscarawas County, Ohio, and additional inactive coal lands in West Virginia, in Ohio County. Bethany had to qualify to do business in the State of Ohio (and did so) in order to acquire the coal lands in that State. From 1957, to and including December 31, 1964, Bethany acquired a great many additional parcels of inactive coal lands in Tuscarawas County, Ohio, in order to make up "a field"; the total acreage acquired was 3,611.532 acres at a total cost of $303,220.54. In 1957 and 1958, Bethany acquired additional coal lands in West Virginia, in Ohio County and Brooke County, namely, 7,382.148 acres at a total cost of $546,134.23. Valley Camp supplied the funds for all of the above acquisitions. The small amount of Bethany's income has been derived from renting parts of its lands, or buildings thereon, and from gas royalties. In 1959, Bethany received farm building rental income in the amount of $608 and gas royalties totaling $367. This income was from coal lands in Tuscarawas County, Ohio. In 1960, it received $824.28 in rents, and $367 in gas royalties from the same sources. *51 Bethany's returns for 1959 and 1960 were filed with the district director of internal revenue at Cleveland, Ohio. Bethany's office is maintained in Cleveland, Ohio, where Valley Camp has its offices. The officers of Bethany in 1959 and 1960 were: 1959
1960
President
Harry Ewig
Harry Ewig
Vice-President
Herbert Richey
Herbert Richey
Secretary
H. W. Orkin
Henry McGinness
Ass't Secretary
R. W. Homan
Treasurer
H. W. Orkin
H. W. Orkin
Ass't Treasurer
C. W. Steiss
C. W. Steiss In 1960, Bethany's directors were Ewig, Richey, Orkin, Steiss, and T. N. Bradford. Its Executive Committee consisted of Ewig, Richey, Steiss, Bradford, and A. W. Lass. The Acquisition of Alexander Mine: In the summer of 1959, T. N. Bradford (who was then a vice-president and director of Valley Camp, and a director of Bethany, and president of 2 other subsidiaries of Valley Camp) and representatives of Wheeling Steel Corporation commenced negotiations for the purchase and sale of Wheeling's fee interest in the Alexander Mine property. Representatives of Valley Camp and of Bethany had not decided at this time who would be the purchaser, if the negotiations resulted in a sale. *52 The Wheeling management wanted to dispose of the fee interest in the Alexander Mine property in order to raise capital for a steel mill expansion program it had inaugurated On December 1, 1959, it was determined that Bethany, rather than Valley Camp, or any other one of Valley Camp's subsidiaries, would acquire the fee interest in the Alexander Mine property. At this time, Valley Camp, as well as Bethany, owned other property in the vicinity of the Alexander Mine property. At a special meeting of the directors of Bethany held on December 1, 1959, at Triadelphia, West Virginia, a resolution was adopted providing that an assessment would be made against Valley Camp, Bethany's sole shareholder, for $750,000, for the purpose of acquiring the fee interest in the Alexander Mine property, which amount would be treated as paid-in surplus of Bethany, by Bethany. At the same time and place, Valley Camp's directors held a special meeting, at which it was noted that Bethany's directors and shareholder had met on the same day, and that Bethany had levied an assessment against its shareholder for the funds needed to purchase the Alexander Mine property from Wheeling. A resolution was adopted *53 by Valley Camp's directors approving and ratifying the action by Valley Camp's officers in accepting and paying the assessment of $750,000. It was also determined at this meeting that if Wheeling did not sell the Alexander property to Bethany, the $750,000 would be used to obtain additional coal lands, and that the amount of the assessment would be treated as paid-in surplus of Bethany. On the same date, at Triadelphia, but one hour later, at 3:00 P.M., there was a special meeting of Valley Camp's directors at which a resolution was adopted to assess Valley Camp for $750,000, to be treated as paid-in surplus of Bethany. Immediately following these corporate actions, Valley Camp transferred the funds to Bethany to be paid to Wheeling. Through further negotiations, the price asked by Wheeling was reduced to $740,639.65 and the parties agreed to the sale of the Alexander property for this amount. Wheeling conveyed the fee interest in the Alexander property by a deed dated January 1, 1960. In this deed, Bethany is the grantee. W. A. Steele, president of Wheeling, executed the deed on February 29, 1960; it was recorded in Marshall County, West Virginia, on March 2, 1960. Wheeling received *54 the total sum of $740,639.65. It appears that on its books, Bethany allocated, of the above amount, $713,639.65 to the coal in place, and $27,000 to the surface lands, but such bookkeeping entries are not in evidence and cannot be ascertained from the details on Bethany's tax return for 1960. Wheeling also conveyed to Bethany all of its interest in the outstanding coal lease of the Alexander property between Wheeling and Valley Camp. Valley Camp had paid coal royalties to Wheeling in excess of $45,000 per year, under the lease, in each of the years 1957, 1958, and 1959. Under the lease, the lessee (Valley Camp) was responsible for installing various structures at the mine openings and installing certain machinery and fixtures, which at the end of the lease will become the property of the owner-lessor of the mine property; and during the term of the lease, the lessee was obligated to maintain and keep in good repair at its own expense all of the buildings and structures, and to pay the taxes. After the execution of the deed to the Alexander property by Wheeling, no changes were made in the outstanding lease, and Valley Camp continued to pay the coal royalties under the lease at *55 the same rate. In 1960, Valley Camp paid Bethany $48,759.25, as coal royalties. In 1960, Valley Camp took 667,989 tons of coal out of the Alexander mine. From 1932 through 1955, no coal lands were acquired by or in the name of Bethany. At all times, Bethany has been the passive holder of title to inactive reserve coal lands, none of which were leased to others. As of December 31, 1959, according to the balance sheet in Bethany's 1959 return, its only liquid asset was cash, and its cash was only $1,375.27. The Alexander property is the only coal property ever held in the name of Bethany on which a coal mine was being operated. Respondent's basic determination is that in substance, rather than according to form, Valley Camp purchased the Alexander property as of January 1, 1960, and acquired all of the interests in that property, using Bethany, its subsidiary, as a conduit through which Valley Camp channelled its own funds, $740,639.65, to Wheeling, and using Bethany, also, as the holder of the bare legal title; and, therefore, that Valley Camp's payments in 1960 to Bethany do not represent coal royalties, and that Valley Camp, only, is entitled to allowances and deductions for depletion. *56 Bethany is not a party to this proceeding. However, the parties are agreed that if Bethany can be recognized for tax purposes as the owner of the Alexander property, then, regardless of the dollar amount of the alleged royalties which Valley Camp would pay in any year, if the lease were recognized for tax purposes as a continuing lease (during its term), only $2,000 thereof in each year would be taxable income to Bethany, and that amount would be taxable as capital gain under the provisions of section 631(c). This is because, Bethany, if recognized as the purchaser, would receive cost depletion of 7 cents per unit, which would completely offset all of its receipt of royalties at 7 cents per ton. Under the lease the 8 cents per ton rate of royalties applies only to 200,000 tons of coal per year (whether or not mined). After offsetting 7 cents per ton of such royalties against depletion of 7 cents per unit, there would remain each year as capital gain $2,000 (200,000 tons multiplied by 1 cent per ton). In fact, in its 1960 return, Bethany reported as taxable income from Valley Camp, only $2,000.01, capital gain, after deducting $46,759.24, depletion, from $48,759.25 of royalties. *57 Respondent has conceded that petitioner is entitled to a deduction in 1960 of $74,923.19, relating to certain general and administrative expenses. Ultimate Findings 1. Valley Camp purchased the Alexander property as of January 1, 1960, from Wheeling, for which Valley Camp paid Wheeling $740,639.65. Valley Camp had complete dominion and control over the entire transaction. Bethany did not purchase the property, in substance, and held only the bare legal title thereto. The arrangements of Valley Camp, whereby the property was nominally transferred to Bethany, did not serve any bona fide business purpose, apart from tax purposes. 2. Valley Camp's payment to Bethany in 1960 of $48,759 was not a payment of coal royalties, and the payment was not a deductible business expense of Valley Camp. 3. As the owner in 1960 of the Alexander property, the amount of the depletion allowable to Valley Camp is $95,521.26, rather than $70,349.61. Opinion The respondent determined that for tax purposes the purchase transaction with Wheeling was in substance a transaction between Valley Camp and Wheeling; that the form of the transaction, purportedly involving Bethany as the purchaser, cannot *58 be recognized for tax purposes; and that therefore, under section 61, 1954 Code, all of the income realized in 1960 from Valley Camp's operations of the Alexander coal mine is taxable to Valley Camp, without any reduction thereof for the purported "royalties" (paid to Bethany); and that Valley Camp's allowance for depletion shall be computed on the basis of cost depletion based on the purchase price received by Wheeling, thereby increasing Valley Camp's annual deduction for depletion. Respondent also invoked the provisions of section 482, and he made adjustments to Bethany's income tax return for 1960. Bethany is not a party to this case. As far as the record here shows, respondent did not issue a statutory deficiency notice to Bethany. However, the reason for that appears to be that the corresponding adjustments to Bethany's tax return did not produce any deficiency in the tax liability of Bethany. However that may be, respondent's reliance upon the provisions of section 482 was in the alternative in respect to Valley Camp, since the determinations in respect to Valley Camp could come within section 61, if they were made properly, and within section 162(a), relating to business *59 expense deductions, which respondent also invoked. Our considerations are directed first to respondent's determinations under sections 61 and 162(a). If, upon the facts here, respondent's determinations under sections 61 and 162(a) were correct, and are sustained, it will not be necessary to consider respondent's alternative determinations under section 482, in respect of Valley Camp. Upon careful and full consideration of all of the evidence, it is and must be, concluded as follows: That in substance, the Alexander mine property was purchased, as of January 1, 1960, by Valley Camp from Wheeling for $740,639.65, which amount was paid by Valley Camp; that Bethany was merely a conduit through which Valley Camp, in form, made payment of the purchase price to Wheeling, and that Bethany held the bare legal title to the Alexander property, whereas in reality and substance Valley Camp was the real and equitable owner thereof; that following Wheeling's sale, Valley Camp was not any longer, in substance, the lessee of the coal mine; and that in 1960, Valley Camp was taxable under section 61 on all of the income realized from its operations of the Alexander mine, without any reduction thereof *60 for purported "royalties" of $48,759.25 (paid to Bethany), either as a cost of goods sold, or as a business expense deduction under section 162(a); and that respondent properly recomputed and increased Valley Camp's depletion allowance and deduction on the basis of cost depletion on a cost to Valley Camp of $740,639.65. Respondent's determinations under sections 61 and 162(a) are, and must be, sustained. The following discussion relates to the above conclusions and holdings. It is unnecessary to consider the alternative grounds for respondent's determinations under section 482. Bethany at all times has not been a corporation engaged in the active conduct of a business. It was organized December 26, 1931, to take the place of the so-called James A. Paisley trust, which held inactive reserve coal lands. That trust agreement provided that eventually a corporation would be organized to hold the assets of the trust. The stock of Bethany was issued originally to the beneficiaries of the trust in exchange for the trust's assets. At no time has Bethany had any working capital or employees. Prior to the transaction involving the Alexander property, it did not hold the title to any property *61 on which coal mining was conducted, and it did not lease to any coal-mine operator any of the coal lands to which it held the title. As a wholly-owned subsidiary of Valley Camp it continued to be a holding company without any liquid assets or working capital. In 1959, Wheeling wanted to obtain funds for its expanding business interests and was willing to dispose of the Alexander property. Negotiations were carried on by officers of Valley Camp with Wheeling. Valley Camp owns some of the coal lands upon which it conducts mining operations. Valley Camp was in a position to purchase the Alexander property from Wheeling. However, Valley Camp was the lessee of the mine on the Alexander property, and as such it had been paying royalties to Wheeling, and it was entitled to percentage depletion deductions in respect of its interest as a lessee of the coal deposits. If Valley Camp had taken title to the Alexander property from Wheeling, the leasehold interest would have been merged into the fee interest acquired by Valley Camp, as a matter of law, and all of the gross income from its sales of coal extracted from the mine on the Alexander property would have been taxable to Valley Camp. Accordingly, *62 it was advantageous to Valley Camp, for tax purposes, not to acquire the property from Wheeling. In , affirming a decision of this Court, it was held under similar circumstances that the tax consequences of a sale of property are not to be finally determined solely by the means employed to transfer legal title, and that a sale by one person (or taxpayer) cannot be transformed for tax purposes into a sale by another, by using the latter as a conduit through which to pass title. The same reasoning applies, of course, to the means employed to purchase property. It is well established that the formal transfer of legal title is not controlling for tax purposes, and that the substance of a transaction must be ascertained and is controlling for tax purposes. ; ; ; . In the instant transaction, Valley Camp carried on the negotiations with Wheeling for the purchase of the Alexander property, and Valley Camp's funds were *63 used in the purchase. The petitioner, Valley Camp, has failed to establish that Bethany in fact and substance was the purchaser, and that any business purpose of Bethany was served by its purported purchase of the property. As in Court , the channeling of Valley Camp's funds through Bethany to Wheeling, and the transfer of the legal title to Bethany, were mere formalities designed to make the purchase of the Alexander property appear to be other than in substance it was, in order to obtain a reduction in Valley Camp's taxes. It must be concluded, upon the evidence here that in substance Valley Camp purchased the property from Wheeling, and we find that to be a fact. The artificiality and unreality of the purported purchase by Bethany is clearly evident from the amount of the purchase price which was negotiated by Valley Camp. There were an estimated 10,623,933 tons of coal in place at the end of 1959. The price at which Wheeling sold the property $740,639.65, was a little less than 7 cents per ton for 10,623,933 tons ($743,675.31). There is no evidence that the value of the Alexander property at the end of 1959 was much more than the value of the coal *64 deposits. Lacking evidence to the contrary, it may be assumed that apart from the coal deposits, the value of the property was only a nominal amount. It is a heavy strain upon credulity to believe that Valley Camp would transfer in an arm's length transaction to an unrelated corporation, $740,639.65, and at the same time agree to pay an additional $743,675.31 to the same corporation in royalties for coal to be extracted from the property. In effect that is the arrangement Valley Camp seeks to have recognized here, for tax purposes. As has been noted in the findings, if it could be held that Bethany was the purchaser of the property, its receipts of the purported royalty payments, regardless of the dollar amount received in any year, would be offset by a "cost" depletion allowance of 7 cents per unit, except $2,000 each year which would be taxable as capital gain under section 631(c). At the same time, Valley Camp's ordinary income from the sale of the coal mined would be reduced by the full amount of the purported royalty payments as a business expense deduction under section 162(a), or as a cost of goods sold; and in addition, Valley Camp would received an annual percentage depletion *65 deduction under its alleged leasehold interest. The broad scope of section 61 requires the inclusion in gross income of all income from whatever source derived. Valley Camp does not contend that it is not required to include in its gross income all of its receipts from the sale of coal extracted from the Alexander mine each year. It reported those receipts on its 1960 return. On the other hand, deductions, either as a cost of goods sold or as a business expense, are a matter of legislative grace, and the taxpayer claiming such deduction is obliged to prove that it is allowable. The petitioner, Valley Camp, has not established that its payment of $48,759.25 in 1960 to Bethany was in substance and reality an ordinary and necessary business expense, or was in fact a cost of goods sold, because it has failed to establish that Bethany was in substance the purchaser of the Alexander property and, consequently, that it acquired the lease. Since Valley Camp was in substance the purchaser, the lease merged into the fee interest which it acquired. The payments to Bethany were not legally required, and were not royalty payments; and they were no more than a device designed to reduce the amount *66 of Valley Camp's taxable income from the sale of coal extracted from the property. It is held that Valley Camp is not entitled to a deduction of $48,759.25. Respondent's determination increasing Valley Camp's taxable income in that amount is sustained. Since Valley Camp purchased the property, its depletion deduction for 1960 has been properly recomputed and increased by the respondent to $95,521.26 on the basis of the cost to it of $740,639.65. Because of several agreed adjustments and concessions, recomputations of the deficiencies for 1959 and 1960 are necessary under Rule 50. Decision will be entered under Rule 50. Footnotes
1. Respondent made several other adjustments of the several depletion deductions taken on its 1960 return by Valley Camp, which are not in issue, whereby he increased some and decreased others. The net amount of all of those adjustments was $6,202.11 more than the total of $951,200.47 which was deducted.↩
2. In its tax returns for 1959 and 1960, Valley Camp included "The Pittsburg Seam Coal Company" among its subsidiaries and stated that it owned 99 percent of the stock, and that it acquired the shares in 1901. Bethany, in its tax returns for 1959 and 1960, stated that "Pittsburg Seam Coal Company" was a subsidiary, and that it owned 96.875 percent of the shares of Pittsburg, which were acquired in 1935. The seeming discrepancy is not explained here, if in the returns of Valley Camp, "Pittsburg Seam Coal Company" is the same corporation which is named as a subsidiary of Bethany in its returns.↩