Bluefeld Caterer, Inc. v. Commissioner.
Bluefeld Caterer, Inc. v. Commissioner
Docket No. 2168-67.
United States Tax Court
T.C. Memo 1969-56; 1969 Tax Ct. Memo LEXIS 240; 28 T.C.M. (CCH) 315; T.C.M. (RIA) 69056; March 19, 1969, Filed Luther B. Ditch, 6th Floor, Sun Life Bldg., Charles Center, Baltimore, Md., for the petitioner. George K. Dunham, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined the following deficiencies in petitioner's income tax: Fiscal Year Ended
Deficiency
May 31, 1962
$15,531.36
May 31, 1963
$20,370.44
May 31, 1964
$15,789.17
In the Explanation of Adjustments attached to the notice of deficiency, respondent stated as follows: (a) It is determined that income for the taxable years ended May 31, 1962, May 31, 1963 and May 31, 1964 as computed in the attached Exhibit A, *241 which was reported by Camp Cody, Inc., constitutes taxable income to you under the provisions of sections 61 and 482 of the Code. Accordingly respondent increased petitioner's taxable income for the years ended May 31, 1962, 1963 and 1964 by the respective amounts of $31,440, $35,556 and $32,140. Practically all of the deficiencies determined by respondent and the entire amount of such deficiencies which is here at issue results from these adjustments. Thus the sole question presented is whether respondent properly included in petitioner's taxable income under sections 61 or 482, I.R.C. 1954[1] all of the net income of Camp Cody, Inc., a corporation controlled by the same interests as those controlling petitioner, the major activity of which during the taxable years was to hold a leasehold interest in a building containing a ballroom, commissary, and office facilities which it subleased to petitioner for use in petitioner's catering business. Findings of Fact Some of the facts have been stipulated. The stipulation of facts, together with the *242 exhibits attached thereto, is hereby incorporated by this reference. The petitioner, Bluefeld Caterer, Inc., was incorporated on May 31, 1957, under the laws of Maryland. Philip Bluefeld and his wife own one-half of the outstanding shares of stock of petitioner and Louis Bluefeld and his wife own the other half. Petitioner's principal place of business is 401 Reisterstown Road, Baltimore, Maryland and was so at the time the petition in this proceeding was filed. Petitioner filed its federal income tax returns for its fiscal years ended May 31, 1962, May 31, 1963, and May 31, 1964 with the district director of internal revenue, Baltimore, Maryland. During those years the directors and officers of Bluefeld Caterer, Inc. were as follows: Directors: Philip Bluefeld Louis Bluefeld Lester Ellin (1962), accountant Irving Abramson (1963 & 1964), employee of petitioner Officers: President & Treasurer - Philip Bluefeld Vice President & Secretary - Louis Bluefeld Philip and Louis Bluefeld have been engaged in the business of catering for a number of years. This business activity was started prior to World War II when they, in conjunction with their mother, catered *243 out of their home. At that time, they did kosher catering only, limiting themselves to catering various Jewish functions, such as weddings, bar mitzvahs and the like. After the War, the Bluefeld brothers and their 316 father continued their catering business as a partnership. Petitioner corporation was formed in 1957 to conduct the kosher catering activities of the Bluefelds previously carried on by the partnership. In 1953, Louis and Philip Bluefeld formed Woodland Caterers, Inc. to engage in running a non-kosher civilian cafeteria at Fort Holabird in Baltimore, Maryland. Approximately two years after the Bluefelds started operating the cafeteria, it was closed down when the civilian employees were taken away from Fort Holabird. In the fall of 1955, Woodland purchased a boys camp in New Hampshire. Some time after its purchase of the camp, Woodland changed its name from Woodland Caterers, Inc. to Camp Cody, Inc. (hereinafter referred to as Camp Cody). At that time, Camp Cody's corporate power to carry on a non-kosher catering business was revoked, but this power was again granted to Camp Cody when its charter was amended in November 1958. Camp Cody operated the camp at a loss *244 during the summers of 1956, 1957, 1958 and 1959, and the camp was finally sold at a loss in May, 1960. For its fiscal years ending on January 31, 1957, 1958 and 1959, Camp Cody had a total net operating loss of over $50,000. All of the stock of Camp Cody, from the time of its incorporation until the time of the trial of this proceeding, has been owned by Philip and Louis Bluefeld. For the years ending January 31, 1962, 1963, 1964 and 1965, the directors and officers of Camp Cody were as follows: Directors: Philip Bluefeld Louis Bluefeld Lester Ellin (1962 only) Joseph W. Spector (1962 only) Irving Abramson Officers: President & Treasurer - Philip Bluefeld Vice President & Secretary - Louis Bluefeld For some time prior to the taxable years the Bluefelds and, later, the petitioner operated the catering business out of a commissary at 3611 Woodland Avenue in Baltimore, Maryland. Most of the actual catering, at least until 1955, was done in synagogues, halls, and banquet and meeting rooms in hotels, which would be rented in the name of the person who was actually giving the affair which the Bluefelds catered. The rental payments due on account of the use of this *245 space were added into and separately itemized in the final bill presented by the Bluefelds, and subsequently petitioner, to their customers. In 1954 the Bluefelds arranged for Zedmack Corporation, an unrelated corporation, to erect a building at 6307 Reisterstown Road to be used by the Bluefelds for catering private functions involving not more than approximately 225 guests. The premises were patterned in size and decor on the Charles Room in the Belvedere Hotel in Baltimore. The Charles Room was rented to caterers for $400 per affair catered. This building, which was known as Fordleigh, contained the first large ballroom adapted for use by caterers in Baltimore City other than ballrooms in large downtown hotels. This building was leased by Zedmack to a corporation organized, owned, and controlled by the Bluefelds which was named Blue Crest, Inc., and was organized at the insistence of the Bluefelds' attorney, who desired to protect them and their catering business from any potential loss which might result from such a novel project. Blue Crest, Inc. originally subleased the premises to the Bluefeld catering partnership. When petitioner was organized in 1957, it became the sublessee *246 of this property from its related corporation, Blue Crest, Inc. for rentals consisting of the following schedule of prices: Week Ends (Saturday and Sunday):
Banquets, Weddings or Bar Mitz- vahs
$250.00
Saturday Luncheons
125.00
Week Days:
Banquets, Weddings, etc
125.00
Luncheons
75.00
Some time in 1958, the Bluefelds approached the G.G.G. Realty Co. (hereinafter referred to as G.G.G.), an unrelated corporation with regard to the erection of a building to be used for their catering business. G.G.G. was owned by Samuel and Morton Gorn and Irving Gisner and was engaged in building and developing in the Baltimore area. At that time neither G.G.G. nor its shareholders were in any way related to the Bluefelds. The Bluefelds took the Gorns to the various hotel, country club and synagogue halls they normally used in their catering business so that the Gorns could better understand the kind of a building required by the Bluefelds in their catering business. 317 As a result of their conversation, G.G.G. had architectural plans drawn up for the proposed building. The plans were drawn upon the understanding that if no contract for the building was entered into *247 the petitioner would pay half the cost of drawing the plans or $1,000, whichever was less. The location of the building was to be at 401 Reisterstown Road about 10 miles from the center of Baltimore. It was to contain the first large ballroom to be located outside the downtown area of Baltimore and was also to contain rooms to be used for a commissary and for offices. G.G.G. was engaged in the business of constructing buildings according to specified design for the use of specific customers and in the business of leasing such buildings to such users on such terms as would accomplish the return of its investment to G.G.G. and the receipt by it of a profit on the transaction. When the Bluefelds and G.G.G. reached an agreement as to the kind of building which was to be built for the catering operations then carried on by petitioner and as to its location, the Bluefelds gave consideration as to who or what entity should enter into the lease contract with G.G.G. Acting on the advice of both their father and their attorney, Joseph Spector, the Bluefelds formed a new corporation called Bluecrest North, Inc., in June 1958, for the express purpose of entering into and assuming liability *248 under a lease agreement with G.G.G. Shortly after the articles of incorporation of Bluecrest North, Inc. were filed with the State of Maryland, but before it signed any lease with G.G.G. Realty Co., Inc., the Bluefelds were advised by their accountant, Lester Ellin, that Camp Cody could be used in place of Bluecrest North, Inc. to serve the same purposes. The accountant advised them and their lawyer that Camp Cody had operating losses during each of its fiscal years 1957, 1958 and 1959 totaling approximately $52,000 on January 31, 1959. It was the advice of the accountant that if Camp Cody should be used by the Bluefelds as the lessee of the new building to be constructed at 401 Reisterstown Road with petitioner as its sublessee, these losses of Camp Cody could be used "to offset any income that was developed from 401 Reisterstown Road." In January 1959, G.G.G. entered into a lease agreement with Camp Cody, whereby the former was to build a building at 401 Reisterstown Road to specifications previously agreed upon which were incorporated into the lease. The building to be constructed was to be complete in all respects except that the tenant was to provide the heating and air-conditioning *249 systems, additional lighting fixtures needed by the business and the wall finishes of the banquet hall in the building hereafter referred to as "Blue Crest North." The cost of the building was approximately $146,000 and the cost of the land was $72,000. The lease was for a term of 15 years or until June 30, 1974, at an annual net rental of $24,700 commencing from the time Camp Cody entered into possession, and with an option in the tenant to renew the term for a further period of ten years at a reduced rental. Under the terms of the lease, the tenant agreed to pay all taxes, water rents, insurance, light, heat and interior maintenance expenses. The landlord retained responsibility to maintain the roof, exterior walls and parking lot. Only Camp Cody was legally obligated to G.G.G. under this lease. However, with regard to the collectibility of the rents provided for in this lease, the Gorns relied upon the financial integrity and business success of the Bluefeld brothers and the prosperous operation of the catering business carried on by their wholly owned corporation, the petitioner herein, rather than upon the corporate balance sheet of Camp Cody. The balance sheets of Camp Cody *250 showed excesses of its liabilities (without regard to "capital stock") over its assets as of January 31, 1959, 1960, 1961, 1962, and 1963, in the respective amounts of $45,045.68, $66,291.23, $53,932.88, $44,498.17, and $9,840.87. At some time in 1959, G.G.G. conveyed the premises at 401 Reisterstown Road and assigned its lease agreement with Camp Cody to Carl Crisana Development Co. (hereinafter "Carl Crisana"), a corporation formed by the Gorns in June 1959 in connection with their refinancing of the construction operation at 401 Reisterstown Road. The stock of Carl Crisana was originally issued in equal amounts to Samuel Gorn, Morton Gorn, Irving Gisner and Dr. Melvin Kappelman. In 1963, Philip and Louis Bluefeld acquired fifty percent of the outstanding stock in Carl Crisana and in 1965 they acquired the remaining fifty percent of the outstanding shares. On March 26, 1959, Camp Cody and petitioner entered into a Conditional Contract of Sale with the Maryland Refrigeration Co., as the seller, for the installation and sale of a complete air-conditioning and heating system for the banquet hall and offices 318 at 401 Reisterstown Road, for a total purchase price of $41,089. *251 Although petitioner and Camp Cody were both named as "the buyer" in this contract, Camp Cody itself made no payment on account of the purchase price. Petitioner paid $8,589 in cash to the Maryland Refrigeration Co. when the contract was signed. The Baltimore Gas and Electric Co. contributed $5,000 to the payment of this price and the sum of $27,500 was financed by the Baltimore Gas and Electric Co., to whom the contract was assigned by the seller. The monthly payments of $528.18 called for under the contract were made by petitioner and these amounts were added to the account showing loans payable by Camp Cody to petitioner. A payment bond and a performance bond were executed by Maryland Refrigeration Co. in connection with this sale in which the Baltimore Gas and Electric Co. is named obligee. Both bonds name as "additional obligees" Camp Cody, Inc., Bluefeld Caterer, Inc., the G.G.G. Realty Co., Phil Bluefeld, Louis Bluefeld and Milton Bluefeld. Sometime in 1959 petitioner purchased chairs and tables for its use at 401 Reisterstown Road. The Bluefelds caused entries to be made on the books of both corporations purporting to reflect this transaction as a purchase made by petitioner *252 on behalf of Camp Cody. The amounts paid by petitioner on account of these purchases were added to the already considerable account appearing on Camp Cody's books as payable to petitioner to which we shall again make reference, infra. In 1961, after difficulty had developed with the air-conditioning unit, Baltimore Gas and Electric Co. entered into an agreement with petitioner alone to make a number of adjustments to the equipment to improve its performance at no cost to petitioner provided the latter would enter into an airconditioning service contract with Maryland Refrigeration Co. The air-conditioning system and the tables and chairs were carried as assets of Camp Cody on its books. Depreciation computed on the tables and chairs was deducted by it in its returns for the fiscal years ended January 31, 1960, 1961, 1962, 1963 and 1964. For its fiscal years ended January 31, 1960, 1961 and 1962 Camp Cody computed its deductible depreciation on the air-conditioner by using a cost of $41,089 and a depreciation rate of 10%. In its return for the fiscal year ended January 31, 1963, its schedule for depreciation lists as a depreciable asset "Air-Conditioners" acquired June 30, 1959, at *253 a cost of $41,089, on which "depreciation allowed or allowable in prior years" was stated to be $10,272.55 and the amount of "depreciation for this year" calculated at 10% was stated to be $1,032.24, with no explanation as to why this latter amount was not $4,108.90 as it had been in the returns for the 2 prior years. In its return for the fiscal year ended January 31, 1964, no deduction was taken on account of the depreciation of an air-conditioner. On September 9, 1959, Camp Cody entered into a sublease agreement with petitioner wherein it agreed to lease to petitioner the premises at 401 Reisterstown Road for a period of 14 years and 9 months renewable for 10 more years at the option of the petitioner. Under the sublease it was provided that: * * * the Sub-Landlord does hereby rent to the Sub-Tenant that portion of the premises consisting particularly of the commissary, room for offices, and the complete parking area, as well as the tables and chairs and also the use of the entire premises consisting of a ballroom or ballrooms, entrance hall and all other portions thereof, under the following terms and conditions and arrangements: A. The sum of One Thousand Dollars ($1,000.00) *254 per month for that portion of the premises to be used by the Sub-Tenant for its commissary, space for its offices, and the complete parking area. B Ballroom Rentals
Week Ends:
Saturday Luncheons
$175.00
Saturday & Sunday
350.00
Week Day Banquets:
Up to 375 people
250.00
Over 400 people
350.00
* Week Day Luncheons:
Up to 375 people
125.00
Over 400 people
350.00
* Week Day Luncheons:
Up to 375 people
125.00
Over 400 people
175.00
Garden Room: up to 100 people
Week Ends:
Saturday & Sunday
$150.00
Saturday Luncheons
100.00
Week Day:
Evening Banquets
100.00
Luncheon
75.00 319 That with respect to the subtitle B above, it is agreed that inasmuch as it is desirable to have the Sub-Tenant make leasing arrangements, because it has the office force and staff to do so, that the said Sub-Tenant receive a commission of ten percent *255 (10%) for its services in engaging the hall on the various dates, in accordance with the schedule herein enumerated. C. Chairs at the rate of ten cents ($.10) for each chair, and tables at the rate of One Dollar ($1.00) per table, when used and occupied by the Sub-Tenant. D. That the accounting for all of the above rentals shall be on a monthly basis, by which is meant that the One Thousand Dollars ($1,000) per month shall be paid in advance on the first day of each and every month, and that the rental for the chairs and tables and the sums of money due for the ballroom rentals, less the commission of ten percent (10%) shall be paid in full within ten (10) days from the last day of the preceding month, for all charges accruing for the said month. The rental charges to be paid for the use of the Ballroom and for the Garden Room were in the amounts which the Bluefelds intended to pass on to the customers of petitioner as charges for the temporary use of these premises for individual social events included as such "rentals" in the bills presented to the customers for payment. They were fixed by the Bluefelds in amounts which would be competitive with charges made to kosher caterers *256 for the temporary use for short periods of similar facilities in the Baltimore area and also in amounts which would stimulate petitioner's business. [2] These provisions of the sublease were strictly adhered to by both Camp Cody and petitioner on their respective books of account from June of 1959, three months prior to the signing of the sublease through the taxable years in question. For every one of petitioner's customers who contracted for a catered affair at Blue Crest North, the petitioner would include in its bill, a separate item marked "Rental - Blue Crest North," followed by the scheduled price. This price always corresponded to the schedule contained in the sublease with Camp Cody. On January 31, 1959, petitioner's books carried a loans receivable account for amounts it had previously loaned to Camp Cody when the latter was engaged in running a camp at Lake Ossipee, New Hampshire. The balance due petitioner as shown in this account was $104,295.38 as of January 31, 1959. The monthly payments due from Camp Cody to Carl Crisana *257 under the original lease created by G.G.G. to Camp Cody were not paid by Camp Cody but were paid by petitioner by checks drawn on petitioner's bank account. The amount of this payment was then debited to the account on petitioner's books representing loans receivable from Camp Cody. The amounts provided for in the "sublease" agreement between petitioner and Camp Cody as payable to Camp Cody were credited to the account representing loans receivable from Camp Cody as carried on petitioner's books. When there was no longer a debit balance in the loans receivable account, the petitioner set up an account payable to Camp Cody on its books and Camp Cody set up an account receivable from petitioner on its books. Thereafter as amounts came due under its agreement with Camp Cody, petitioner would credit its account payable to Camp Cody on its books and Camp Cody would credit its account receivable from petitioner. When petitioner would make the payments to Carl Crisana, it would debit the account payable account and Camp Cody would credit the payment against the receivable due it from petitioner. From the time it signed the lease agreement with Camp Cody until January 31, 1964 no cash changed *258 hands between petitioner and Camp Cody under the agreement of September 9, 1959. The only business which Camp Cody purported to do during the taxable years was leasing and subleasing the Blue Crest North facility and renting the air-conditioner, tables and chairs used in the banquet hall. During these years Camp Cody held separate meetings of its board of directors and shareholders, kept separate minute books and kept separate accounting records which recited that Camp Cody repaid prior loans to petitioner with interest, purchased, owned and rented all of the tables and chairs used in the Blue Crest North banquet hall and purchased and owned the air-conditioner used in Blue Crest North. These tables, chairs and air-conditioner were actually purchased by petitioner, but were carried as assets on the books of Camp Cody. Camp 320 Cody also filed state and federal income tax returns for these years paying the State of Maryland $1,697.34 in income, franchise and tangible property taxes for its fiscal year ending January 31, 1964. Camp Cody took depreciation on its tables and chairs for its fiscal years ending January 31, 1962 through January 31, 1964. It claimed depreciation on the *259 air-conditioner as stated above. During the years in question and since the sale of its camp property, Camp Cody did not advertise, maintained no active bank account and had no employees. During the taxable years in question, the amounts credited by petitioner on its books to Camp Cody under its agreement with Camp Cody of September 9, 1959, were as follows: *10 Month
Year Ending May 31
1962
1963
1964
June
$ 8,271.82
$ 7,380.10
$ 12,586.93
July
2,827.00
3,515.68
2,127.70
August
3,918.70
3,862.54
6,807.07
September
3,563.56
4,897.00
5,967.55
October
4 ,913.83
7,096.06
5,164.30
November
5,551.66
6,736.33
8,934.85
December
4,835.80
10,278.10
8,256.70
January
5,69 0.26
6,118.30
5,265.55
February
6,283.45
8,198.20
7,178.95
March
6,448.42
10,035.82
6,986.98
April
6,166.90
6,801.67
7,153.38
May 8,814.70
10,105.12
11,043.00
Total
$67,286.10
$85,024.92
$87,472.96
On its returns for the fiscal years ended January 31, 1960, 1961, 1962, 1963 and 1964, Camp Cody reported as income the amounts credited to it by petitioner under the lease agreement of September 9, 1959. For the taxable years in question, this *260 was the only income Camp Cody reported. In its returns for its fiscal years ending January 31, 1961, 1962 and 1963 Camp Cody stated that its principal business activity was "Hall Rental." In its returns for the fiscal years ending January 31, 1962, 1963 and 1964, all of the income reported by it was described in the returns as "Rents." For all of its fiscal years 1961 through 1964, Camp Cody applied against the taxable income shown in its returns, the net operating losses incurred while operating the boys camp. Hence Camp Cody paid no income tax for its fiscal years ended January 31, 1960, 1961, 1962 and 1963. For its fiscal year ended January 31, 1964, Camp Cody paid a tax of $8,222.23, after reducing its taxable income as shown on its return by $10,968.02, the remaining amount of net operating loss incurred in the operation of the camp. On its returns for the fiscal years ended May 31, 1962, 1963 and 1964, petitioner deducted on account of "Rent" the amounts of $104,853.68, $124,788.90 and $125,596.41, respectively, which included the amounts credited to Camp Cody on its books under the lease agreement of September 9, 1959 as rent. Since Camp Cody and petitioner were on different *261 fiscal years, respondent took the annual net income (gross income less deductions) of Camp Cody derived from its purported rental business during each of Camp Cody's four fiscal years which coincided in whole or in part with the three fiscal years of petitioner here in question and divided each such annual net income figure of Camp Cody by twelve. The monthly net income amounts thus determined for Camp Cody were allocated by the month from Camp Cody to petitioner. The sum of the monthly net income amounts thus allocated from Camp Cody to petitioner during each of petitioner's fiscal years here at issue were added by respondent to determine the additional net income attributed to petitioner for each of these taxable years. The rental income reported by Camp Cody as sub-landlord and the rental payments deducted by petitioner as sublessee under the sublease here involved were not arm's length rental charges in amounts which would have charged in independent transactions between unrelated parties under similar circumstances. Respondent properly allocated to petitioner all of the income reported by Camp Cody which exceeded amounts paid under the lease between Camp Cody and Carl Crisana *262 and other expenses paid by Camp Cody as lessee of premises located at 401 Reisterstown Road in order to clearly reflect petitioner's income. Opinion KERN, Judge: Petitioner as sublessee made payments totaling the approximate sums of $67,000, $85,000 and $87,000 during its fiscal years 1962, 1963 and 1964, respectively to Camp Cody as sub-landlord, purportedly on account of rentals due on the sublease of business property consisting of a building erected for the use of petitioner at the instance of the individuals who owned all of petitioner's stock and all of the stock of Camp Cody, the alleged sub-landlord. The 321 sublease covered the same property and was for the same term of years as the property and term covered by the original lease to Camp Cody, executed just 8 months before by the owner of the property, a corporation in no way related to petitioner or to Camp Cody, which called for the payment by Camp Cody of annual rentals in the amount of $24,700. Because of the fact that Camp Cody had accumulated net operating losses in a large amount from wholly unrelated activities in prior years (the operation of a boys camp) which could be used for tax purposes to offset any *263 income it would receive, it paid no federal income taxes on the large rentals paid by petitioner to it pursuant to the sublease, which payments were deducted by petitioner as ordinary and necessary business expenses and thus reduced petitioner's taxable income. The persons who controlled both petitioner and Camp Cody arranged for Camp Cody to act as sub-landlord of the sublease to petitioner in order to accomplish this tax result. The respondent by his determination of deficiency has in effect restored to petitioner's taxable income all of the amounts paid by petitioner to Camp Cody, and deducted from petitioner's gross income, which were in excess of the amounts which Camp Cody was obligated to pay under the terms of its lease agreement with the owner of the property leased and subleased. The amounts thus restored to petitioner's income included amounts paid by petitioner as "rentals" for the use of the chairs and tables which petitioner had bought for the purpose of equipping the premises purportedly subleased by petitioner. The technique followed by respondent in his determination of deficiency was to determine that such excess of Camp Cody's receipts over the payments it was *264 obliged to make pursuant to the lease which it purported to hold from the owner of the premises here in question "[constituted] income to [petitioner] under the provisions of section 61 and 482 of the Code." Section 61 contains the broad definition of gross income as being "all income from whatever source derived, including (but not limited to)" certain items. Section 482 is set out in the margin hereof. [3] We also set out in the margin certain parts of income Tax Regs., section 1.482 which we consider pertinent to this case. [4]
*265 Both petitioner and respondent have argued at length with regard to whether the 322 corporate existence of Camp Cody should be disregarded, the petitioner strenuously contending that it should not be disregarded since at the very least it was used for the valid business purpose of in some way insulating petitioner from liability in connection with petitioner's "[obtaining] the exclusive use of an enlarged catering facility in a risky expansion of its business" [5] and since it (Camp Cody) actually carried on the business activity of leasing the premises from G.G.G. and subleasing them to petitioner. [6]
We consider it is unnecessary to resolve this argument since it is our view that even though we were to concede that the corporate existence of Camp Cody should not be disregarded or that *266 a sublease between Camp Cody and petitioner was in fact executed, respondent's determination here was fully justified under section 482 and otherwise. Petitioner and Camp Cody were "* * * two * * * organizations * * * owned or controlled * * * by the same interests." The question under section 482 is whether the action taken by respondent was necessary "clearly to reflect the income" of petitioner, bearing in mind the statements in Income Tax Regs. section 1.482-1(b) that the purpose of this section "is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer," and that "The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." Section 1.482-2 (c) of the Regulations [7] further states that "an arm's length rental charge" in cases of subleases entered into by controlled corporations shall be an amount "equal to all the *267 deductions claimed by the owner (lessee) [the sub-lessor] which are attributable to the property for the period such property is used by the user * * * [including] the rent paid * * * by the owner (lessee) [the sub-lessor] during the period of use and all other deductions directly or indirectly connected with the property paid * * * by the owner (lessee) [sub-lessor] during such period." Thus we consider that the crucial question for our decision is whether the 323 payments made by petitioner to Camp Cody pursuant to the terms of the sublease arranged by the interests controlling both corporations, assuming arguendo that they were so made, constituted arm's length rental charges within the meaning of section 482 and the quoted regulations. With regard to this question it would be irrelevant to consider whether there was a business purpose for the use of Camp Cody by the Bluefelds as lessee and sub-landlord *268 (such as the insulation in some way of petitioner from liability). See Local Finance Corp., 48 T.C. 773, aff'd - F. 2d - (C.A. 7 opinion filed February 28, 1969); Eli Lilly & Co. v. United States, 372 F. 2d 990, 998-9 (Ct. Cl.); Dillard-Waltermire, Inc. v. Campbell, 255 F. 2d 433 (C.A. 5). In our opinion the so-called rental payments made by petitioner to Camp Cody in annual amounts which during the taxable years averaged $55,000 in excess of the amounts which Camp Cody was obligated to pay under its lease of the same premises from an unrelated party (and average annual amounts in excess of 27 percent of the cost of the land and building covered by the sublease) were not arm's length rental charges. Petitioner's principal argument with regard to the arm's length character of the transaction may be paraphrased as follows: the sublease with regard to "the hall rental" is in substance not a lease but an agency contract with petitioner acting as "Camp Cody's sole agent for renting the hall" and consequently "there is no question about the arm's length rental charge since the hall rentals were merely prearranged rates which petitioner had agreed *269 to collect from its customers each time the hall was rented." Petitioner further argues that it "has never in any economic sense possessed or controlled the primary income-producing property - the banquet hall" and "merely acted as a conduit for passing the rentals from the customer to Camp Cody." This argument is refuted by the facts that the sublease rented to petitioner "the use of the entire premises consisting of ballroom or ballrooms, entrance hall and all other portions thereof" in return for which petitioner agreed to pay "ballroom rentals," that "the sums of money due for the ballroom rentals * * * shall be paid in full within ten (10) days from the last day of the preceding month, for all charges accruing for the said month" without any limitation of petitioner's liability to the amounts which it had collected from its customers, that all sums paid under the sublease including "ballroom rentals" were received by Camp Cody as "rent," and that they were deducted by petitioner as "rent." There is implicit in petitioner's argument a contention that since the "Ballroom Rentals" set out in the sublease are comparable to charges made for the occasional use of a period of hours *270 of similar facilities by Baltimore hotels they are to be considered as arm's length rentals. We point out in refutation of this argument that under the terms of the sublease petitioner was entitled to "the use of the entire premises consisting of a ballroom or ballrooms," for a period of 14 years 9 months and that in return for its long period of use granted thereby petitioner agreed to pay "Ballroom Rentals" in amounts roughly equal to the charges made by the owners of other premises for the "one-shot" temporary use of such premises for a few hours by caterers in connection with a single social event. Payments so obviously incomparable cannot be considered as being in any way proof that the sublease, even though not to be disregarded for tax purposes as a sham, is an arm's length transaction. As we have indicated we have concluded on the entire record herein that the payments made by petitioner to Camp Cody under the provisions of the sublease arranged by the interests controlling both corporations were not arm's length rental charges. We also conclude that the adjustments and allocations made by respondent in his determination of deficiency are appropriate to this case and accomplish *271 the objectives of the statute and quoted regulations. Petitioner observes that Camp Cody received the payments made under the sublease by the credits described in our findings as "income which it [Camp Cody] earned as the natural consequence of the economic risk which it assumed by signing the initial lease with G.G.G. Realty Co., so Camp Cody should rightfully reap the economic benefits." We are unable to see any risks run by Camp Cody, a corporation which was at all times pertinent to our issue completely insolvent, which was not in any real sense the owner of assets, which had no employees and which had an inactive bank account which remained at $91.95 during the taxable years. In this connection 324 we also point out: (1) that even though Camp Cody was considered to be the owner of the chairs, tables and air-conditioner, its assets would still be considerably less than its liabilities, and (2) that the alleged "economic risk" assumed by Camp Cody under its original lease with G.G.G. and which, as we see it, could not have been more than a risk that the payments required to be made by it to G.G.G. might be greater than the payments which would be received by it from petitioner *272 under the sublease, was less of an "economic risk" than that faced by G.G.G. with regard to its collection of rentals from Camp Cody; yet, despite this greater "economic risk," G.G.G., an unrelated corporation, received under the lease an annual arm's length rental charge of $24,700, while Camp Cody, facing an "economic risk" under its lease and sublease which, if it existed at all, was less than the risk of G.G.G., received an average annual "rental" of over $79,000. We say that Camp Cody was not the true economic owner of assets during the taxable years since we believe that the tables and chairs and the air-conditioner were in substance assets of petitioner rather than of Camp Cody. They were purchased and paid for by petitioner and were used in petitioner's business. There is no proof and, in fact, no claim by petitioner that these assets have a useful life in excess of the term of the sublease. Indeed the rates of depreciation thereon were on the basis of considerably shorter lives. Thus it seems clear that these assets will be of use to and used by petitioner only, the party which purchased them. In our opinion the testimony concerning bookkeeping entries does not constitute *273 evidence which sustains petitioner in its burden of proof herein in view of the undisputed facts appearing in the record. For this additional reason, petitioner should not be permitted to deduct any of so-called rental payments to Camp Cody for the use of tables and chairs because they were in fact purchased by petitioner and were used by it in the conduct of its business and the generation of its income. While they were formally placed as assets on the books of Camp Cody by petitioner's officers and employees, there is no satisfactory proof that they were bought on behalf of Camp Cody in order to fill its business needs rather than those of petitioners. Petitioner has failed to establish that the payments of these so-called rentals constituted ordinary and necessary business expenses deductible by it from its gross income. It follows that for federal tax purposes no credits should be made on account of such alleged "rentals" to the account on the books of Camp Cody representing the balance due on loans made by petitioner to Camp Cody in earlier years. See Valley Camp Coal Co. v. Commissioner, 405 F. 2d 1208 (C.A. 6 opinion filed January -, 1969, affirming a memorandum *274 opinion of this Court ( T.C. Memo. 1967-225, 26 T.C.M. 1147)). Decision will be entered for the respondent. 325 Footnotes
1. Hereafter all statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
*. These 2 items are accurately quoted from the copy of the sublease which is in evidence. We are unable to even speculate as to why in the first item the rent payment for the use of the ballroom for week-day luncheons for over 400 people is stated to be $350, while in the second item it is stated to be $175.↩
2. With regard to these rental payments, Louis Bluefeld testified: "During the week we had a reduction price because it was an incentive * * *."↩
3. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses. ↩
4. Sec. 1.482-1(b). Scope and purpose. (1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. (c) Application. Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes. In determining the true taxable income of a controlled taxpayer, the district director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances. The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Sec. 1.482-2(c). Use of tangible property - (1) General rule. Where possession, use, or occupancy of tangible property owned or leased by one member of a group of controlled entitles (referred to in this paragraph as the owner) is transferred by lease or other arrangement to another member of such group (referred to in this paragraph as the user) without charge or at a charge which is not equal to an arm's length rental charge (as defined in subdivision (i) of subparagraph (2) of this paragraph), the district director may make appropriate allocations to properly reflect such arm's length charge. Where possession, use, or occupancy of only a portion of such property is transferred, the determination of the arm's length charge and the allocation shall be made with reference to the portion transferred. (2) Arm's length charge. (i) For the purposes of this paragraph, an arm's length rental charge shall be the amount of rent which was charged, or would have been charged for the use of the same or similar property, during the time it was in use, in independent transactions with or between unrelated parties under similar circumstances considering the period and location of the use, the owner's investment in the property or rent paid for the property, expenses of maintaining the property, the type of property involved, its condition, and all other relevant facts. If neither the owner nor the user was engaged in the trade or business of renting property, the arm's length rental charge for the taxable year shall be deemed to be equal to the amount specified in subdivision (ii) or (iii) of this subparagraph, whichever is appropriate, unless the taxpayer establishes a more appropriate charge under the standards set forth in the first sentence of this subdivision. For purposes of this subdivision, an owner or user shall be considered to be in the trade or business of renting property if it engages in the trade or business of renting property of the same general type as the property in question to unrelated parties. An owner or user will not be considered to be engaged in the trade or business of renting property of the same general type solely on the basis of casual or infrequent rentals of property which is predominently used in its trade or business. (ii) Except as otherwise provided in subdivision (iii) of this subparagraph the amount referred to in subdivision (i) of this subparagraph for the taxable year shall be equal to the sum of the following amounts attributable to the property: * * * (iii) Where possession, use, or occupancy of tangible property leased by the owner (lessee) is transferred by sublease or other arrangement to the user, the amount referred to in subdivision (i) of this subparagraph shall be equal to all the deductions claimed by the owner (lessee) which are attributable to the property for the period such property is used by the user. Where only a portion of such property was transferred, any allocations shall be made with reference to the portion transferred. The deductions to be considered include the rent paid or accrued by the owner (lessee) during the period of use and all other deductions directly and indirectly connected with the property paid or accrued by the owner (lessee) during such period. Such deductions include deductions for maintenance and repair, utilities, management, and similar deductions.↩
5. In this phase of its argument petitioner minimizes to the point of practically ignoring the obligations which petitioner assumed in the sublease from Camp Cody. ↩
6. In this phase of its argument petitioner minimizes to the point of practically ignoring the facts that petitioner had no active bank account, drew no checks in payment of its obligations as lessee and had no employees.↩
7. The fact that this regulation was not promulgated until 1968 (T.D. 6932, 1968-1 C.B. 218, 228) is immaterial, and petitioner makes no argument that the regulation should not be retroactive. See Helvering v. Reynolds, 313 U.S. 428↩ (1941).